# In the United States Court of Federal Claims

No. 23-46C
Filed: February 2, 2023<sup>*</sup>
FOR PUBLICATION

| |
|---|
| **NEXT PHASE SOLUTIONS AND SERVICES, INC.,** |
| *Plaintiff,* |
| **v.** |
| **UNITED STATES,** |
| *Defendant,* |
| *and* |
| **INDEX ANALYTICS, LLC** |
| *Defendant-Intervenor.* |

*Alexander Brewer Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, DC, with *Michael J. Anstett* and *Katherine L. St. Romain*, of counsel, for the plaintiff.

*Joshua W. Moore*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, *Ethan S. Chae*, U.S. Department of Health and Human Services, of counsel, for the defendant.

*Damien Clemens Specht*, Morrison & Foerster LLP, Washington, DC, with *James A. Tucker* and *Krista A. Nunez*, of counsel, for the defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

**HERTLING**, Judge

---

<sup>*</sup> Pursuant to the protective order in this case, this opinion was filed under seal on February 1, 2023.  The parties were directed to propose redactions of confidential or proprietary information by February 8, 2023.  The parties jointly submitted proposed redactions on February 2, 2023. (ECF 25.)  The Court adopts the parties' redactions, as reflected in this public version of the opinion.  Redactions are denoted with three asterisks in square brackets, [***].

The plaintiff, Next Phase Solutions and Services, Inc. ("Next Phase"), filed this bid protest on January 12, 2023, against the United States, acting through the Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services.  In September 2022, CMS awarded a contract to the defendant-intervenor, Index Analytics, LLC ("Index Analytics"), to manage CMS's Open Payments System ("OPS").  The contract includes migrating the OPS to the cloud.  After unsuccessfully protesting the contract award before the Government Accountability Office ("GAO"), the plaintiff filed suit in this court to set aside the contract award.

Next Phase alleges that CMS acted arbitrarily and capriciously when it gave a low-confidence rating to the plaintiff's performance work statement ("PWS") because of the PWS's analysis of alternative approaches to the OPS cloud migration.  Next Phase asserts that its approach was required by the solicitation; it also alleges that Index Analytics' offer, which proposed a specific solution for the OPS cloud migration, violated the terms of the solicitation.  But for these errors, Next Phase alleges that it would have been awarded the OPS contract.

Arguing that it will be irreparably harmed by the refusal of CMS to cease the newly initiated transition of the OPS contract to Index Analytics, Next Phase has moved for a preliminary injunction pending the resolution of its protest.  Next Phase has demonstrated neither a likelihood of success on the merits nor prejudice in the absence of a preliminary injunction.  Accordingly, Next Phase's motion is denied.

## I.      BACKGROUND

On June 30, 2022, CMS issued Solicitation No. RFQ-CMS-2022-220829, seeking quotations from small-business General Services Administration "[Multiple Award Schedule] Contract Holders."  (ECF 1-2 at 223.)  The solicitation sought offers to "manage all aspects of the [OPS] and supporting services pertaining to Open Payments Program (OPP) requirements" on a time and material cost basis for a one-year period beginning on September 29, 2022, with several extension options.  (*Id.* at 223-24, 284.)  This work would entail completing five tasks: (1) successfully transitioning to the contract; (2) providing project management for all required duties; (3) supporting the operations, maintenance, and enhancement of the OPS; (4) providing and supporting the "Help Desk infrastructure"; and (5) modernizing the OPS and transitioning it to the cloud.

The solicitation explained that quotations would be evaluated in two phases; CMS would make its ultimate evaluation of offers based on five factors.  In descending order of importance these factors were: (1) relevant experience; (2) the PWS; (3) oral presentation; (4) accessibility under section 508; and (5) price.  (*Id.* at 259-60.)  The solicitation also explained that CMS anticipated evaluating the non-price factors based on "high, some, low, or no confidence in the ability of the respondent to successfully pursue achievement of the Government's intent, with the expectation of little need for Government intervention."  (*Id.* at 259.)  Based on these factors, CMS would use "a tradeoff process to determine which quote represents the Best Value to the Government, as defined in FAR 2.101 and described in FAR 8.405."  (*Id.*)

In Phase 1, CMS would evaluate all offers based solely on offerors' relevant experience and make advisory down-selections;[1] CMS would then "notify each respondent of CMS's determination of whether the respondent should participate in the next phase." (*Id*. at 259-60.) Down-selected offerors were permitted to opt-in to Phase 2. In Phase 2, CMS would evaluate the remaining factors as well as conflicts of interest. (*Id.*) Because the plaintiff's protest "focuses on Factors 2 and 5," (ECF 21 at 15), only these two factors are considered in detail.

Under factor 2, the solicitation required that each offeror "present a clear and concise [PWS] that demonstrates [its] understanding and approach of all work to be performed related to the Statement of Objectives (SOO)." (ECF 1-2 at 265.) The PWS had to "[p]rovide an approach for modernization of the OPS that clearly address[es]," among other things, "transitioning OPS from the current CMS on-premises to the modernized OPS in cloud hosting solution." (*Id.*) An offeror's modernization approach also had to address current system maintenance and:

> demonstrate seamless transition with no downtime and include but not be limited to: all business and operations necessary to fully migrate from the existing OPS to the modernized OPS in cloud hosting without diminishing current operational capability and the proposed approach should be operational excellence, secure, reliable, scalable, efficient, and cost optimized and includes alternatives and refactor of architecture and technology stacks (i.e., software, hardware, and database) that best fit for OPS in the cloud hosting solution and OPP's current and long-term needs.

(*Id.*)

The solicitation also included a Statement of Objectives ("SOO"), (*id.* at 284-304), that itself included a Concept of Operations ("CONOPS"). (*Id.* at 305-80.) The CONOPS described "Task 5 - OPS Modernization & Transition to the Cloud." (*Id.* at 355-59.) For Task 5, the awardee would, among other things:

> Provide an alternative analysis of different solutions relating to modernization and cloud migration effort, i.e., identify, assess, compare multiple alternatives, e.g., cloud service providers, multi-cloud, hybrid-cloud approaches, different service designs, etc., help balance cost, performance, and schedule of the solution and present CMS each alternative's pros and cons and the recommended/suitable solution to help to make a sound decision.

(*Id.* at 357.)

---

[1] FAR 1817.7000(a) defines down-selection as: "[i]n a phased acquisition, the process of selecting contractors for later phases from among the preceding phase contractors."

Additionally, the CONOPS contained a list of deliverables, which included an "Analysis of Alternatives for OP Business Case" that would be due "15 calendar days before submitting the business case to [the Governance Review Board ("GRB")] for Proof of Concept or [Minimal Viable Product ("MVP")] or as on [sic] needed basis before getting the GRB approval." (*Id.* at 372.)  The MVP Launch itself was due six months after the award.  (*Id.*)

CMS received questions from prospective offerors about what they should include in their offers.  (ECF 1-2 at 278-83.)  CMS incorporated its answers into the solicitation.  In these answers, CMS repeatedly stated, in one form or another, that offerors "should propose their best technical approach for migrating the current OPS to a cloud environment."  (*Id.* at 279 (Q&A Nos. 21, 24-25), 282 (Q&A Nos. 82, 85).)

CMS also prepared an Independent Government Cost Estimate ("IGCE"), that estimated the cost of this time and materials contract at $48,602,042.00.  (*Id.* at 517, 526-27.)

CMS received eight offers, including those from the plaintiff and Index Analytics.  Next Phase's proposal included [***] as a subcontractor.  (ECF 21 at 6.)  Of the eight offers submitted and evaluated in Phase 1, five were advised not to proceed to Phase 2.  (ECF 1-2 at 496.)  CMS subsequently evaluated the remaining three offers in Phase 2.  (*Id.*)

On September 22, 2022, CMS issued an award-decision memorandum that awarded the contract to Index Analytics.  (*Id.* at 492-530.)  The memorandum explained that the three Phase 2 offers were evaluated by a technical evaluation panel ("TEP") based on the remaining four factors with the following results:

| Evaluation Factors | Next Phase Solutions | Index Analytics | Third Offeror |
| --- | --- | --- | --- |
| Factor 2: PWS | Low Confidence | High Confidence | Some Confidence |
| Factor 3: Oral Presentation | Some Confidence | High Confidence | Some Confidence |
| Factor 4: Section 508 | Low Confidence | Low Confidence | Some Confidence |
| Factor 5: Price | $38,904,411.39 | $24,794,501.29 | $29,846,197.33 |

(ECF 23-2 at 195, 198.)

On the PWS factor, CMS explained that it had low confidence in Next Phase's PWS because:

> [T]he Offeror did not provide a detailed technical solution, choosing to propose providing an analysis of alternatives after award, for CMS to determine the strategy going forward. By not submitting a firm technical approach, the TEP does not know if their technical solution is sound and able to meet the SOO requirements. As a result, the Government has low confidence that the Offeror can understand and deliver requirements using a sound approach.

4

(ECF 1-2 at 512.)[2]  In contrast, Index Analytics received a high confidence rating for its PWS in part because:

> The Offeror's proposed strategy of parallel teams to accomplish tasks concurrently, raises confidence that the SOO requirements will be completed in a timely manner.  The proposed personnel and the parallel teams approach also support a seamless transition and allow the Offeror to immediately begin addressing legislated requirements and timelines, even during the transition-in period. Lastly, the Offeror proactively proposed multiple innovative approaches, including but not limited to [***], [***] and [***], to addressing known pain points in the OPS and OPP.

(*Id.*)

On pricing, CMS noted that it had made an error resulting in the IGCE overestimating costs.  "The [IGCE's] level of effort (LOE) was estimated based on the peak season, which is only three months, and extrapolated for the whole year as opposed to taking into consideration the lower LOE for nine months out of the year." (*Id.* at 515.)  CMS considered the price of the offers of both Next Phase and Index Analytics realistic and in line with their respective technical approaches. (*Id.* at 514-15.)

CMS noted that Next Phase's cost estimate appeared to be higher because "they do not have a technical solution in their PWS and propose to do an analysis of alternatives to determine their strategy and then complete the cloud migration with modernization being done over the life of the contract." (*Id.* at 514.)  CMS noted that Next Phase's failure to provide "a detailed technical solution" meant that CMS could not determine if all objectives of the solicitation could be completed at Next Phase's proposed price or if more funds would be needed after Next Phase completed a technical analysis. (*Id.* at 528.)

In contrast, CMS determined that Index Analytics' parallel approach would "allow[] for the modernization and migration to be performed at the same time" and would "reduce[] level of effort hours needed." (*Id.* at 515.)  CMS expressed confidence in Index Analytics' price because its offer's "proposed technical solution will fulfill all objectives listed in the SOO at a fair and reasonable price." (*Id.*)

In its discussion of the tradeoffs between Index Analytics and Next Phase, the CMS award-decision memorandum noted Next Phase's failure to provide "detailed technical solutions," while highlighting that Index Analytics had "proposed innovative approaches." (*Id.*

---

[2] CMS's evaluation is in line with the plaintiff's own description of its PWS, which it has referred to as a "framework that would allow Next Phase to present an analysis of proposed alternative migration solutions to CMS after award, and, ultimately, to implement the chosen solution." (ECF 21 at 8.)

at 527.)  CMS concluded that "Index Analytics has a significant technical advantage over Next Phase Solutions while maintaining a fair, reasonable, and realistic price, which is lower than that of Next Phase."  (*Id.*)

Based on its evaluation, CMS determined that the offer from Index Analytics presented the best-value offer to the government because it had received the highest evaluations and proposed the lowest quoted price.  (*Id.* at 525.)  CMS therefore awarded the contract to Index Analytics.

On October 7, 2022, Next Phase filed a bid protest with the GAO.  On December 29, 2022, the GAO issued its decision denying the bid protest.  (ECF 23-2 at 215-22.)   The GAO determined that the "plain language of the solicitation is contrary to the protester's assertion that the solicitation did not contemplate inclusion of alternative solution analysis in quotations and precluded the recommendation of a specific solution."  (*Id.* at 215.)   The GAO rejected the plaintiff's argument that the solicitation required offerors to submit only "'high-level framework that could be used to generate alternative approaches [after award].'"  (*Id.* at 220-22 (quoting the plaintiff's bid protest filings).)  The GAO instead determined that:

> [T]he plain language of the solicitation provided specific instructions on "[h]ow to prepare [the PWS] volume," unambiguously stating that the quotation should demonstrate the vendor's understanding and approach for "all work to be performed" under the SOO. Further eliminating any ambiguity, directly below this instruction, the solicitation provided a detailed list of objectives that quotations should address. Finally, in response to vendors' questions regarding the content of their quotations, the agency repeatedly stated that vendors "should propose their best technical approach."

(*Id.* at 222.)  The GAO therefore rejected the plaintiff's arguments as "an unsupportable interpretation of the solicitation" that was contrary to the solicitation's plain language.  (*Id.*)

On January 12, 2023, the plaintiff filed its complaint.  (ECF 1.)  The plaintiff's complaint alleges two claims for relief.  First, the plaintiff alleges that CMS's evaluation of quotations under factor 2 (PWS) was arbitrary and capricious.  Specifically, the plaintiff alleges that CMS improperly marked down the plaintiff's proposal based on its inclusion of an "analysis of alternatives approach," while improperly marking up Index Analytics' proposal for proposing a specific solution for the OPS cloud migration.  (*Id.* at ¶¶ 70-89.)  Second, the plaintiff alleges, in the alternative, that the solicitation was latently ambiguous.  (*Id.* at ¶¶ 90-93.)  The plaintiff argues that this latent ambiguity requires that the solicitation be amended "to clarify the requirement and permit offerors to compete intelligently for [the solicitation] th[r]ough the submission of revised quotations."  (*Id.* at ¶ 94.)

After CMS declined to stay the initiation of transition activities under the award, Next Phase filed this motion for a preliminary injunction on January 23, 2023.  (ECF 21.)  The

defendant and Index Analytics each filed a response on January 26, 2023.  (ECF 22-23.)  Oral argument was held on February 1, 2023.

## II.  STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The purpose of a preliminary injunction in a bid protest is to preserve the status quo pending resolution of the case on the merits.  *See Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 994 (Fed. Cir. 2018).

The party seeking a preliminary injunction bears the burden of establishing four factors. First, the moving party must establish that it is likely to succeed on the merits.  Second, the moving party must be likely to suffer irreparable harm absent preliminary injunctive relief. Third, the balance of equities must tip in the moving party's favor.  Fourth, a preliminary injunction must be in the public interest.  *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *Cont'l Serv. Grp.*, 722 F. App'x at 993.

A plaintiff may not be granted preliminary relief "unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm."  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original); *see also Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1348 (Fed. Cir. 2019) (upholding a decision by the Court of International Trade to deny a preliminary injunction based on a lack of irreparable harm even though the lower court declined to consider the other preliminary injunction factors); *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[I]rrespective of relative or public harms, a movant must establish both a likelihood of success on the merits *and* irreparable harm . . . ." (Emphasis in original)).  Once both of the first two criteria are met, no single factor is dispositive, but "the absence of an adequate showing with regard to any one factor may be sufficient" to deny a motion for a preliminary injunction.  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

## III.  DISCUSSION

The plaintiff argues that the four factors for a preliminary injunction are met, and that the defendant should therefore be enjoined from moving forward with the transition of the contract to Index Analytics.

### A.  Likelihood of Success on the Merits

The plaintiff is unlikely to succeed on the merits of its bid protest.  Next Phase argues that its high-level framework approach was required by the solicitation; the defendant and Index Analytics both argue that the plain text of the solicitation supports their position.  The key therefore is the interpretation of the solicitation.

Bid protest cases are reviewed under the standard set forth in the APA, that is whether an agency's decision was "arbitrary and capricious."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  An agency acts in an arbitrary and capricious manner when it "materially deviates from the evaluation scheme described in the solicitation."  *L-3 Comms.*

*EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 654 (2008); *see also CliniComp Int'l v. United States*, 117 Fed. Cl. 722, 741 (2014) (calling agency selections of contract awardees based on factors not within the solicitation "quintessential examples of conduct which lacks a rational basis" (internal citation and quotation omitted)).

To determine whether there was a material deviation, a court must interpret the solicitation.  The Federal Circuit has explained that:

> Interpretation of the solicitation is a question of law over which we exercise independent review. We begin with the plain language of the document.  The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them.  Finally, we must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.

*Banknote Corp. of Am., Inv. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (internal citations omitted).

The plaintiff argues that it is likely to succeed on the merits for two reasons.  First, it argues that the CONOPS mandated its "analysis of alternatives" approach when it required a successful offeror to "'suggest different approaches and recommendations for CMS to determine the most efficient and the best methodology for migrating Open Payments onto the cloud.'" (ECF 21 at 30 (quoting ECF 1-2 at 355).)  The CONOPS also included an "Analysis of Alternatives" deliverable.  Based on the CONOPS, the plaintiff argues that solicitation required offerors not to proposal a particular approach to or solution for the cloud-migration process.  As a corollary, Next Phase argues that Index Analytics' offer was inconsistent with the solicitation because its PWS "effectively deprived CMS of the benefit of the process described by the CONOPS document, whereby the agency would choose its preferred cloud migration solution after reviewing the analysis of alternatives submitted almost six months after award."  (*Id.* at 33.)

Second, in the alternative, Next Phase argues that if the solicitation could support CMS's reading of its requirements, then the solicitation suffered from a latent ambiguity.  As a result of that latent ambiguity, Next Phase was deprived of the opportunity to submit a compliant offer that included a specific proposal to address the cloud migration.  In support of this argument, Next Phase relies on the IGCE, which was most in line with its own proposed price.  (*Id.* at 33-34.)

The solicitation's description of how the PWS factor would be evaluated makes no mention of Next Phase's proposed "analysis of alternatives" approach.  At most, the PWS factor references that an approach should include "alternatives."  (ECF 1-2 at 265.)  The PWS factor, however, also requires that the awardee "[p]rovide an approach for modernization of the OPS that clearly address[es]" a number of detailed requirements including "transitioning OPS from the current CMS on-premises to the modernized OPS in cloud hosting solution."  (*Id.*)  The

reference to "alternatives" in the PWS factor is referring to alternatives to the offeror's main suggested approach, and not a requirement that offerors provide a high-level analysis of alternatives. Indeed, Index Analytics' offer reflects that reading of the solicitation. Index Analytics included certain alternatives in its PWS but only after proposing a specific approach to OPS cloud migration. (*Id.* at 459; *see also* ECF 21 at 9, 21-23 (the plaintiff referring to Index Analytics' proposal as including a "cursory[] Analysis of Alternatives").) By contrast, language requiring a full "analysis of alternatives" appears only in the SOO, in which the solicitation discusses the specific tasks the awardee would be performing. (ECF 1-2 at 355, 357, 372.)

The absence of clear "analysis of alternatives" language in the PWS makes sense when one considers the purpose of the PWS. The PWS was required so that offerors could "demonstrate[] their understanding and approach of all work to be performed related to the Statement of Objectives . . . ." (*Id.* at 265.) In other words, the PWS required offerors to show CMS that they understood what was required by the solicitation and to explain their approach to the required tasks while recognizing alternatives. Satisfactory offers would enable CMS to review offerors' technical approaches and assess whether they understood and could therefore perform the required tasks.

The SOO, by contrast, addresses deliverables and actual work under the contract. The SOO's required "analysis of alternatives" makes sense in context. The "analysis of alternatives" is due almost six months after award. By that time, the awardee should have become familiar with the OPS and may have realized that it needed to revise the approach proposed in its offer. The CONOPS's description of "Task 5 – OPS Modernization & Transition to the Cloud" makes this reading the most consistent with the solicitation. On this point, the CONOPS explains:

> The Contractor shall perform detailed analysis and evaluation of an existing data center (e.g., services, applications, data, and tools), propose, and implement a well-architected cloud infrastructure framework that is reliable, resilient, highly available, scalable, and secure. The Contractor shall evaluate and suggest different approaches and recommendations for CMS to determine the most efficient and the best methodology for migrating Open Payments onto the cloud. The contractor shall define, develop, optimize and manage the comprehensive cloud migration plan to describe an approach, identify any gaps or redundancies (to avoid delays, optimize the cost, and reduce operational issues), alternative analysis to help with decision making, tasks, timelines for the successful implementation.

(*Id.* at 355.)

Next Phase is correct that this description of Task 5 specifies that CMS will "determine the most efficient and the best methodology for migrating Open Payments onto the cloud." (*Id.*) This description, however, does not contradict the PWS's requirement that each offeror "[p]rovide an approach for modernization of the OPS that clearly address[es] . . . transitioning OPS from the current CMS on-premises to the modernized OPS in cloud hosting solution." (*Id.*

at 265.)  Rather, these two sections may easily be read in harmony.  The PWS required offerors to suggest an approach for modernizing and migrating the OPS to the cloud to demonstrate their knowledge of the work that would be required while discussing possible alternatives.  The SOO then required the awardee to perform an analysis of alternatives based on its growing familiarity with the OPS, something no offeror would be able to do in advance.  Only after the awardee became familiar with the OPS, after completing the onboarding process, could it propose to CMS various alternative approaches on the modernization and migration of the OPS to the cloud based on a fuller understanding of the OPS.

This harmonized reading also makes sense of the timeline for the "Analysis of Alternatives" deliverable.  This deliverable is due 15 days before the MVP launch, which itself is due six months after contract award.  (*Id.* at 372.)  If the plaintiff's reading were correct, then the awardee would have to wait for CMS to pick a suggested approach and then use that approach to build an MVP in just 15 days.  Reading the solicitation to require the completion of such complicated work in so short a time is facially unreasonable.  Rather, the timeline for the development of the MVP makes sense if the two requirements are read as proposed by CMS and Index Analytics.

Reading the SOO not to incorporate the plaintiff's preferred "analysis of alternatives" approach also aligns the solicitation with CMS's answers, incorporated into the solicitation, to the questions it received.  In responding to questions, CMS repeatedly explained that all offerors "should propose their best technical approach for migrating the current OPS to a cloud environment."  (*Id.* at 279 (Q&A Nos. 21, 24-25), 282 (Q&A Nos. 82, 85).)  CMS also clarified in response to one question that "[t]he [CONOPS] provides information on the current system's government furnished hardware and software but the contractor needs to propose their solution for the cloud migration and modernization objectives."  (*Id.* at 279 (Q&A No. 24.)   In response to a different question about CMS's planned technologies, the agency answered that "CMS is looking for the contractor to propose [its] best technical solution, which could include new technologies."  (*Id.* at 279 (Q&A No. 82).)  CMS's answers clarify that despite the CONOPS document, offerors needed to propose a specific solution for the OPS cloud migration.  CMS's clarifications that it sought offeror's best technical approaches, including possibly new technologies, also would not make sense if an offeror was forbidden from offering a detailed "best technical approach" to the cloud migration and could only provide a high-level framework for an analysis of alternatives, as the plaintiff argues.

Next Phase argues that CMS read the solicitation in the same way as the plaintiff does by relying on the IGCE, which was almost $10 million higher than Next Phase's proposed price.  It is not clear why the fact that Next Phase's offer was closest in price to the IGCE of $48.6 million means that CMS must have had the same understanding of the solicitation as Next Phase.  The leaps of logic required to fill the *lacuna* in the record must fall to ground in the absence of record proof to support the argument.  The alignment of an agency's price estimate and an offeror's proposed price does not necessarily reflect on how the agency understood the requirements of the solicitation.  The burden is on the plaintiff to make the case, and here it cannot do so.

While it is true that CMS said that both the plaintiff's cost estimate and "[t]he IGCE [were] prepared assuming a linear approach to the cloud migration and modernization tasks," a

linear approach is not necessarily synonymous with an "analysis of alternatives" approach. (*Id.* at 514.)

In any event, CMS explained that the reason the IGCE was so high, and therefore closest to Next Phase's proposed price, was due to a calculation error. CMS acknowledged that the IGCE's "level of effort (LOE) was estimated based on the peak season, which is only three months, and extrapolated for the whole year" without considering "the lower LOE for nine months out of the year." (*Id.* at 514.) CMS noted that Next Phase's cost estimate and LOE were "higher than the other contractor's proposals because they have already performed the effort of determining a technical strategy that includes performing the modernization and migration efforts in parallel." (*Id.*) CMS also concluded that Index Analytics' parallel approach, undertaking the modernization and migration efforts at the same time, would save the government money compared to the linear approach it had used for the IGCE, further explaining any price discrepancies between Index Analytics and the IGCE. (*Id.* at 515.)

In short, CMS made a mistake in the IGCE. As a result, the IGCE was closest to Next Phase's proposed price, which itself was the highest price among the three offers evaluated due to the additional work it proposed to develop the alternative approaches. Such a coincidence of errors is not evidence of how to read the solicitation.

The IGCE therefore does not support the plaintiff's argument that the "analysis of alternatives" approach was required by the solicitation in the PWS, or that offerors were forbidden from presenting specific solutions in their proposed PWS.

Next Phase either misread the solicitation's requirements when it chose not to include a detailed technical approach to the OPS cloud migration in its PWS or it failed to develop one that its team could support for inclusion in its offer. Next Phase's offer was not rejected simply for proposing an "analysis of alternatives" approach, because its proposal was permitted under the solicitation. Rather, "[b]y not submitting a firm technical approach, the TEP d[id] not know if [Next Phase's] technical solution is sound and able to meet the SOO requirements. As a result, the Government has low confidence that the Offeror can understand and deliver requirements using a sound approach." (*Id.* at 511-12; *see also* ECF 23-2 at 136 (the TEP in the evaluation worksheet criticizing the plaintiff's approach because the lack of technical detail prevented the TEP from determining if Next Phase had proposed "a sound approach")).)

Next Phase's proffered interpretation of the solicitation is contrary to the plain text of the solicitation, which is not ambiguous. Even if the solicitation supported Next Phase's interpretation that an offeror was supposed to use an "analysis of alternatives" approach to its offer, Next Phase has not identified any provision that precluded CMS from considering a more detailed offer that proposed a specific solution. Therefore, Next Phase has not identified any solicitation provision that prevented Index Analytics from offering only what Next Phase calls a "cursory[] Analysis of Alternatives" (ECF 21 at 9), before also providing a specific approach. Next Phase has also failed to identify any provision of the solicitation that precluded CMS from assessing Index Analytics' or any other offeror's proposal based on its inclusion of a specific solution for the OPS cloud migration.

11

The plaintiff has accordingly not shown that it is likely to succeed on the merits of its claim; to the contrary, Next Phase is *unlikely* to succeed on the merits.

**B.      Irreparable Harm**

Next Phase argues that it will suffer irreparable injury absent a preliminary injunction. The plaintiff identifies only a single injury: the potential that, based on information Index Analytics would obtain during the transition period, Next Phase would have "no realistic possibility of competing" for a re-solicitation of the award if it succeeds on the merits of this protest.  (ECF 21 at 34-36.)  As already noted, it is unlikely that Next Phase will succeed on the merits of its protest, but even if that were not the case, Next Phase has failed to demonstrate that it will suffer irreparable harm in the absence of an injunction.

Making a showing of irreparable harm is a high bar to clear.  "A preliminary injunction will not issue simply to prevent a mere possibility of injury, even where prospective injury is great.  A presently existing, actual threat must be shown."  *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1379 (Fed. Cir. 2009) (internal citation and quotation omitted).  "Such a threat of imminent, irreparable injury exists when a plaintiff shows that, absent a preliminary injunction, it would be deprived of the only remedy available were it to succeed on the merits. 'In other words, irreparable injury may be found if the grant of a preliminary injunction is the only way to preserve the plaintiff's ability to litigate its claim.'" *IBM Corp. v. United States*, 118 Fed. Cl. 677, 683–84 (2014) (quoting *Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 98 (2010) (other internal citation omitted)).

The plaintiff's argument falls short on two grounds.  First, Next Phase implies that Index Analytics will become entrenched.  This argument has been rejected numerous times.  *See IBM Corp.*, 118 Fed. Cl. at 684 (noting that "the court has consistently found unpersuasive arguments like IBM's in which incumbents seek to base a showing of irreparable harm on the possibility that the successful offeror would gain advantages during a transition period that might affect the successful protester's capacity to compete for a new contract."); *Eskridge Rsch. Corp.,* 92 Fed. Cl. at 99 ("[T]he plaintiff's contention that without a preliminary injunction, [the awardee] will become so entrenched that [the plaintiff] will have lost its opportunity to compete does not demonstrate irreparable harm.").

Additionally, as now-Chief Judge Kaplan has previously held, the risk of a newcomer gaining access to the incumbent's "proprietary tools and processes, thereby allowing [the newcomer] to improve the quality of its technical proposal and gain a competitive advantage, is not enough to establish irreparable injury." *IBM Corp.*, 118 Fed. Cl. at 684.  The plaintiff's attempt to "show irreparable harm by claiming generically that the winner's transition into performance will give it advantages" is insufficient. *Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 729 (2016).

To avoid these precedents, the plaintiff argues that, during the transition, Index Analytics will necessarily conduct discussion with CMS that will entwine it with CMS personnel in a manner akin to an organizational conflict of interest ("OCI").  The plaintiff, however, could not identify a specific action injurious to Next Phase that Index Analytics and CMS will take during

the early phases of the contract-transition period.  Next Phase asserts only that such potential discussions could allow Index Analytics to refine its approach to the OPS cloud migration, thereby giving it a leg up in any future competition of the award were Next Phase to prevail in this protest.  The burden is on the plaintiff to identify "[a] presently existing, actual threat," not just the mere possibility of an injury. *Qingdao Taifa Grp. Co.*, 581 F.3d at 1379 (internal citation and quotation omitted).  This novel argument analogizing the potential for harm here to an OCI  is not supported by the record and is too speculative to satisfy the plaintiff's burden.

In any event, the defendant has agreed to resolve this protest on an expedited basis. Index Analytics will not fully transition onto the contract until July 30, 2023.  Until then, the incumbent contractor [***] will still be providing services to CMS.  (ECF 23 at 30.)  If the plaintiff ultimately prevails, the transition could be blocked at a relatively early stage, before Index Analytics can learn too much of value and before it even assumes work under the contract, much less has a chance to entrench itself.  The defendant notes that during the first two months of the transition Index Analytics will mostly be engaged in administrative work and otherwise working in collaboration with [***].  (*Id.* at 30-31.)

Contrary to its argument that it will be injured, Next Phase appears to be trying to preserve unto itself the benefit of the knowledge of [***].  Under these facts, Next Phase's requested injunction functions more like a sword against Index Analytics and less like a shield for itself.

In any case, the risk of injury to the plaintiff is negligible because, [***] the plaintiff will likely have indirect access to the same information that Index Analytics will have.  The defendant has also expressed a willingness to share any information provided to Index Analytics with other offerors if a re-solicitation becomes necessary, minimizing any potential harm.  (*Id.* at 30.)

Although the plaintiff protests that it would have "no realistic possibility of competing for" the contract if "CMS is compelled to take corrective action and re-solicit quotations," that assertion is not persuasive.  (ECF 21 at 35, 40.)  The plaintiff has not identified any support for this assertion beyond the generic claim that any knowledge gained by Index Analytics during the early stages of the transition will allow it to tailor any solution it offers in response to a re-solicitation to CMS's needs.  This claim is belied by the fact that Index Analytics, a non-incumbent contractor with no inside knowledge, received the highest possible evaluation for its proposed PWS.

Any harm the plaintiff alleges it might suffer absent a preliminary injunction appears at most speculative and, in any case, is of the sort that other judges of this court have previously found inadequate to support preliminary relief.  Further, even if the plaintiff could identify some actual injury, the defendant has offered sufficient reassurances that such harm could be mitigated while this case is considered on an expedited basis.  Therefore, the plaintiff has not shown that it will suffer any irreparable injury absent a preliminary injunction.

Because Next Phase has shown neither irreparable harm nor a likelihood of success on the merits, the balance of the equities and the public-interest factors need not be addressed.  *See*

*Sumecht NA, Inc.*, 923 F.3d at 1348; *Amazon.com*, 239 F.3d at 1350; *Reebok Int'l Ltd.*, 32 F.3d at 1556.

## IV.     CONCLUSION

Next Phase has demonstrated neither a likelihood of success on the merits nor any prospect of irreparable harm.  Accordingly, the plaintiff's motion for a preliminary injunction is **DENIED**.

The parties shall jointly propose any redactions to this Memorandum Opinion and Order by **February 8, 2023**, so that it may be released publicly.  The parties shall submit by **February 8, 2023**, a joint status report proposing a schedule for further proceedings on the merits of the plaintiff's claims.

It is so **ORDERED**.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**